16 U.S. 116 (____)
3 Wheat. 116
GELSTON et al.
v.
HOYT.
Supreme Court of United States.

*117 *130 March 24th, 1817. The Attorney-General (Rush), for the plaintiffs in error.
Hoffman, and D.B. Ogden, for the defendant in error.
*141 February 27th. STORY, Justice, delivered the opinion of the court.
This is a writ of error to the highest court of law of the state of New York; and the questions which are re-examinable upon the record in this *court are such only as come within the purview of the 25th section [*303 of the judiciary act of 1789, ch. 20.
But a preliminary question has been made, which must be discussed, before proceeding to consider the merits of the cause. It is contended, that the record is not, and cannot be brought, before this court.
By the judicial system of the state of New York, the decisions of their supreme court are revised and corrected in a court of errors, after which, the record is returned to the supreme court, where the judgment, as corrected, is entered, and where the record remains. In this case, the writ of error was received by the court of errors, after the record had been transmitted to the supreme court whose judgment was affirmed. It is contended, that the record, being no longer in the court of last resort in the state, can, by no process, be removed into this court.
The judiciary act allows the party who thinks himself aggrieved by the decision of any inferior court, five years, within which he may sue out his writ of error, and bring his cause into this court. The same rule applies to judgments and decrees of a state court, in cases within the jurisdiction of this court. As the constitutional jurisdiction of the courts of the *142 Union cannot be affected by any regulation which a state may make of its own judicial system, the only inquiry will be, whether the judiciary act has been so framed as to embrace this case. The words of the act are, "that a final judgment or decree in any suit in the highest court of law or *304] *equity of a state in which a decision could be had, where is drawn in question," &c., "may be re-examined, and reversed or affirmed, in the supreme court of the United States, upon a writ of error, the citation being signed," &c. The act does not prescribe the tribunal to which the writ of error shall be directed. It must be directed, either to that tribunal which can execute it; to that in which the record and judgment to be examined are deposited, or to that whose judgment is to be examined, although from its structure it may have been rendered incapable of performing the act required by the writ. Since the law requires a thing to be done, and gives the writ of error as the means by which it is to be done, without prescribing, in this particular, the manner in which the writ is to be used, it appears to the court, to be perfectly clear, that the writ must be so used as to effect the object. It may, then, be directed to either court in which the record and judgment on which it is to act may be found. The judgment to be examined must be that of the highest court of the state having cognisance of the case, but the record of that judgment may be brought from any court in which it may be legally deposited, and in which it may be found by the writ. In this case, the writ was directed to the court of errors, which, having parted with the record, could not execute it. It was then presented to the supreme court; but being directed to the court of errors, could not regularly be executed by that court. In this state of things, the parties *305] consented to waive all objections *to the direction of the writ, and to consider the record as properly brought up, if, in the opinion of this court, it could be now properly brought up on a writ of error directed to the supreme court of New York. The court being of opinion, that this may be done, the case stands as if the writ of error had been properly directed.
The original suit was brought by the defendant in error, against the plaintiffs in error, for an alleged trespass, for taking and carrying away, and converting to their own use, the ship American Eagle, and her appurtenances, and certain ballast and articles of provisions, &c., the property of the defendant in error. This is the substance of the declaration, although there are some differences in alleging the tort, in the different counts. The original defendants pleaded, in the first place, the general issue, not guilty, to the whole declaration; and then two special pleas. The first special plea, in substance, alleges, that the said ship was attempted to be fitted out and armed, and that the ballast and provisions were procured for the equipment of the said ship, and were put on board of the said ship as a part of her said equipment, with intent that the said ship should be employed in the service of a foreign state, to wit, of that part of the island of St. Domingo which was then under the government of Petion, to commit hostilities upon the subjects of another foreign state, with which the United States were then at peace, to wit, of that part of the island of St. Domingo which was then under the government of Christophe, contrary to the form of the statute *306] in *such case made and provided; and that the original defendants, by virtue of the power and authority, and in pursuance of the instructions and directions of the president of the United States, seized the said *143 ship, &c., as forfeited to the use of the United States, according to the statute aforesaid, &c. The second special plea is like the first, except that it does not state that the ship was seized as forfeited, but alleges that the ship was taken possession of and detained, under the instructions of the president of the United States, in order to the execution of the prohibition and penalties of the act in such case made and provided; and except that it omits the allegations under the videlicets in the first plea, specifying the foreign state by or against whom the said ship was to be employed. To these pleas, there is a general demurrer, and joinder in demurrer, upon which the state court gave judgment in favor of the original plaintiff.
Upon the trial of the general issue, a bill of exceptions was taken to the opinion of the court. By that bill of exceptions, among other things, it appears, that the original plaintiff, at the trial, gave in evidence, that at the time of the seizure, the ship was in his actual full and peaceable possession; that the ship, upon the seizure, had been duly libelled for the alleged offence in the district court of New York; that the original plaintiff appeared and duly claimed the said ship; and upon the trial, she was duly acquitted, and ordered to be restored to the original plaintiff by the district court; and that a certificate of reasonable cause for the seizure of the said ship had been denied. The plaintiff then gave in evidence, *that the value of the [*307 ship, at the time of her seizure, was $100,000; and that the said Schenck seized and took possession of the said ship, by the written directions of the said Gelston; but no other proof was offered by the plaintiff, at that time, of any right or title in the said plaintiff to the said ship; and here the original plaintiff rested his cause. The original defendants then insisted before the court, that the said several matters, so produced and given in evidence on the part of the original plaintiff, were not sufficient to entitle him to a verdict, and prayed the court so to pronounce, and to nonsuit the plaintiff. But the court refused the application, and declared, that the said several matters so produced and given in evidence, were sufficient to entitle the plaintiff to a verdict, and that he ought not to be nonsuited. To which opinion, the original defendants then excepted: and the original plaintiff then gave in evidence, that he purchased the said ship of James Gillespie, who had purchased her of John R. Livingston and Isaac Clason, the owners thereof, and that in pursuance of such purchase, the said Gillespie had delivered full and complete possession of the said ship, &c., to the original plaintiff, before the taking thereof by the original defendants.
The original defendants (having given previous notice of the special matter of defence to be given in evidence on the trial, under the general issue, according to the laws of New York) offered to prove and give in evidence, by way of defence, and in mitigation of damages, the same matter of forfeiture alleged in their first special plea, with the additional fact that *the said Gelston was collector, and the said Schenck was surveyor of [*308 the customs of the district of New York, and as such, and not otherwise, made the seizure of the ship, &c. And the original defendants did, thereupon, insist, that the said several matters, so offered to be proved and given in evidence, ought to be admitted in justification of the trespass charged against the defendants, or in mitigation of the damages claimed by the plaintiff, and prayed the court so to admit it. But the counsel for the plaintiff, admitting that the defendants had not been influenced by any *144 malicious motive in making the said seizure, and that they had not acted with any view or design of oppressing or injuring the plaintiff, the court overruled the whole of the said evidence, so offered to be proved by the original defendants, and did declare it to be inadmissible, in justification of the trespass charged against the defendants; and after the admission so made by the original plaintiff's counsel, that the said evidence ought not to be received in mitigation or diminution of the said damages, as the said admission precluded the plaintiff from claiming any damages, by way of punishment or smart money, and that after such admission, the plaintiff could only recover the damages actually sustained, and with that direction, left the cause to the jury.
From this summary of the pleadings, and of the facts in controversy at the trial, it is apparent, that this court has appellate jurisdiction of this cause, only so far as is drawn in question the validity of an authority exercised under the United States, and the decision is against the validity thereof, *309] and so far as *is drawn in question the construction of some clause in a statute of the United States, and the decision is against the title, right, privilege or exemption specially set up or claimed by the original defendants, for to such questions (so far as respects this case), the 25th section of the judiciary act has expressly restricted our examination. Whether such a restriction be not inconsistent with sound public policy, and does not materially impair the rights of other parties, as well as of the United States, is an inquiry deserving of the most serious attention of the legislature. We have nothing to do, but to expound the law as we find it; the defects of the system must be remedied by another department of the government.
The cause will be first considered, in reference to the bill of exceptions. In respect to the proof of the original plaintiff's cause of action, and the opinion of the court, that such proof was sufficient to entitle him to a verdict, no error has been shown upon the argument; and certainly none is perceived by this court. If, however, there were any error in that opinion, we could not re-examine it, for it is not within the purview of the statute. It does not draw in question any authority exercised under the United States, nor the construction of any statute of the United States.
In respect to the rejection of the evidence offered by the original defendants, to prove the forfeiture, and their right of seizure, there can be no doubt, that this court has appellate jurisdiction, if, by law, that evidence ought to have been admitted, in justification of the trespass charged on the original *310] defendants; for *it involves the construction of a statute of, and an authority derived from, and exercised under, the United States.
In order to establish the admissibility of the evidence offered by the defendants, it is necessary for them to sustain the affirmative of the following propositions: 1. That a forfeiture had been actually incurred under the statute of 1794, ch. 50. 2. That it was competent for a state court of common law to entertain and decide the question of forfeiture. 3. That the sentence of acquittal in the district court was not conclusive upon the question of foreiture. 4. That the defendants, as officers of the customs, had a right to make the seizure.
Upon the last point, there does not seem to be much room for doubt. At common law, any person may, at his peril, seize for a forfeiture to the *145 government; and if the government adopt his seizure, and the property is condemned, he will be completely justified; and it is not necessary, to sustain the seizure or justify the condemnation, that the party seizing shall be entitled to any part of the forfeiture. (Hale on the Customs, Harg. Tracts, 227; Roe v. Roe, Hardr. 185; Malden v. Bartlett, Parker 105; though Horne v. Boosey, 2 Str. 952, seems contrà.) And if the party be entitled to any part of the forfeiture (as the informer, under the statute of 1794, ch. 50, is, by the express provision of the law), there can be no doubt, that he is entitled in that character to seize. (Robert v. Witherhead, 12 Mod. 92.) In the absence of all positive authority, it might be proper to resort to these principles, in aid of *the manifest purposes of the law. But there are [*311 express statutable provisions, which directly apply to the present case. The act of the 2d of March 1799, ch. 128, § 70, makes it the duty of the several officers of the customs, to make seizure of all vessels and goods liable to seizure by virtue of any act of the United States respecting the revenue; and assuming the statute of 1794, ch. 50, not to be a revenue law, within the meaning of this clause, still the case falls within the broader language of the act of the 18th of February 1793, ch. 8, § 27, which authorizes the officers of the revenue to make seizure of any ship or goods, where any breach of the laws of the United States has been committed. Upon the general principle, then, which has been above stated, and upon the express enactment of the statute, the defendants, supposing there to have been an actual forfeiture, might justify themselves in the seizure. There is this strong additional reason in support of the position, that the forfeiture must be deemed to attach, at the moment of the commission of the offence, and consequently, from that moment, the title of the plaintiff would be completely divested, so that he could maintain no action for the subsequent seizure. This is the doctrine of the English courts, and it has been recognised and enforced in this court, upon very solemn argument. (United States v. 1960 Bags of Coffee, 8 Cranch 398; The Mars, Ibid. 417; Robert v. Witherhead, 12 Mod. 92; 1 Salk. 223; Wilkins v. Despard, 5 T.R. 112.)
In the next place, can a state court of common law, entertain and decide the question of forfeiture *in this case. This is a question of vast [*312 practical importance; but in our judgment, of no intrinsic legal difficulty. By the constitution, the judicial power of the United States extends to all cases of law and equity, arising under the constitution, laws and treaties of the United States, and to all cases of admiralty and maritime jurisdiction; and by the judiciary act of 1789, ch. 20, § 9, the district courts are invested with exclusive original cognisance of all civil causes of admiralty and maritime jurisdiction, and of all seizures on land and water, and of all suits for penalties and forfeitures, incurred under the laws of the United States. This is a seizure for a forfeiture under the laws of the United States, and consequently, the right to decide upon the same, by the very terms of the statute, exclusively belongs to the proper court of the United States; and it depends upon its final decree, proceeding in rem, whether the seizure is to be adjudged rightful or tortious. If a sentence of condemnation be pronounced, it is conclusive, that a forfeiture is incurred; if a sentence of acquittal, it is equally conclusive against the forfeiture; and in either case, the question cannot be litigated in another forum. This was the doctrine asserted by this court, in the case of Slocum v. Mayberry (2 Wheat. 1), *146 after very deliberate consideration; and to that doctrine we unanimously adhere.
The reasonableness of this doctrine results from the very nature of proceedings in rem. All persons having an interest in the subject-matter, whether as seizing officers, or informers, or claimants, are parties, or may *313] be parties, to such suits, so far as their interest *extends. The decree of the court acts upon the thing in controversy, and settles the title of the property itself, the right of seizure, and the question of forfeiture. If its decree were not binding upon all the world, upon the points which it professes to decide, the consequences would be most mischievous to the public. In case of condemnation, no good title to the property could be conveyed, and no justification of the seizure could be asserted under its protection. In case of acquittal, a new seizure might be made by any other persons, toties quoties, for the same offence, and the claimant be loaded with ruinous costs and expenses. This reasoning applies to the decree of a court having competent jurisdiction of the cause, although it may not be exclusive. But it applies with greater force to a court of exclusive jurisdiction; since an attempt to re-examine its decree, or deny its conclusiveness, is a manifest violation of its exclusive authority. It is doing that indirectly, which the law itself prohibits to be done directly. It is, in effect, impeaching collaterally, a sentence which the law has pronounced to be valid, until vacated or reversed on appeal by a superior tribunal.
The argument against this doctrine, which has been urged at the bar, is, that an action of trespass will, in case of a seizure, lie in a state court of common law, and therefore, the defendant must have a right to protect himself, by pleading the fact of forfeiture in his defence. But at what time and under what circumstances, will an action of trespass lie? If the action be commenced, while the proceedings in rem for the supposed forfeiture are *314] pending in the *proper court of the United States, it is commenced too soon; for, until a final decree, it cannot be ascertained, whether it be a trespass or not, since that decree can alone decide, whether the taking be rightful or tortious. The pendency of the suit in rem would be a good plea in abatement, or a temporary bar of the action, for it would establish that no good cause of action then existed. If the action be commenced after a decree of condemnation, or after an acquittal, and there be a certificate of reasonable cause of seizure, then, in the former case, by the general law, and in the latter case, by the special enactment of the statute of the 25th of April 1810, ch. 64, § 1, the decree and certificate are each good bars to the action. But if there be a decree of acquittal, and a denial of such certificate, then the seizure is established conclusively to be tortious, and the party is entitled to his full damages for the injury.
The cases also of Wilkins v. Despard (5 T.R. 112) and Robert v. Witherhead (12 Mod. 92, 1 Salk. 323), have been relied on, to show that a court of common law may entertain the question of forfeiture, notwithstanding the exclusive jurisdiction of the exchequer in rem. But these cases do not sustain the argument. They were both founded on the act of navigation, 12 Car. II., ch. 18, § 1, which, among other things, enacts, that one-third of the forfeiture shall go to him "who shall seize, inform or sue for the same, in any court of record." So that it is apparent, that in respect to forfeitures under this statute, the exchequer had not an exclusive jurisdiction, *147 but that the other courts of common law had *at least a concurrent jurisdiction. And if these cases did not admit of this obvious distinction, certainly, they could not be admitted to govern this court, in ascertaining a jurisdiction vested by the constitution and laws of the United States exclusively in their own courts.
It is, therefore, clearly our opinion, that a state court has no legal authority to entertain the question of forfeiture in this case; and that it exclusively belonged to the cognisance of the proper court of the United States. Indeed, no principle of general law seems better settled, than that the decision of a court of a peculiar and exclusive jurisdiction must be completely binding upon the judgment of every other court, in which the same subject-matter comes incidentally in controversy. It is familiarly known, in its application to the sentences of ecclesiastical courts, in the probate of wills and granting of administrations of personal estate; to the sentences of prize-courts in all matters of prize jurisdiction; and to the sentences of courts of admiralty, and other courts acting in rem, either to enforce forfeitures or to decide civil rights.
In the preceding discussion, we have been unavoidably led to consider and affirm the conclusiveness of the sentence of a court of competent jurisdiction proceeding in rem, as to the question of forfeiture; and à fortiori, to affirm it, in a case where there is an exclusive jurisdiction. In cases of condemnation, the authorities are so distinct and pointed, that it would, after the very learned discussions in the state court, be a waste of time to examine them at large. Nothing can be better settled, than that a sentence of condemnation *is, in an action of trespass for the property [*316 seized, conclusive evidence against the title of the plaintiff. (See Harg. Tracts 467, and cases there cited; Thomas v. Withers, cited by Mr. Justice BULLER, in Wilkins v. Despard, 5 T.R. 112, 117; Scott v. Shearman, 2 W. Bl. 977; Henshaw v. Pleasance, Ibid. 1174; Geyer v. Aguilar, 7 T.R. 681, and case cited by Lord KENYON, Ibid. 696; Meadows v. Duchess of Kingston, Ambler 756; 2 Evans' Pothier on Obligations, 346 to 367.)
A distinction, however, has been taken, and attempted to be sustained at the bar, between the effect of a sentence of condemnation, and of a sentence of acquittal. It is admitted, that the former is conclusive; but it is said, that it is otherwise as to the latter, for it ascertains no fact. It is certainly incumbent on the party who asserts such a distinction, to prove its existence by direct authorities, or inductions from known and admitted principles. In the Duchess of Kingston's case (11 State Trials 261; Runnington Eject. 364; Hale, Hist. Com. Law, by Runnington, note, p. 39, &c.), Lord Chief Justice DE GREY declares, that the rule of evidence must be, as it is often declared to be, reciprocal; and that in all cases in which the sentences favorable to the party are to be admitted as conclusive evidence for him, the sentences, if unfavorable, are, in like manner, conclusive evidence against him. This is the language of very high authority, since it is the united opinion of all the judges of England; and though delivered in terms applicable strictly to a criminal suit, must be *deemed equally to apply to civil suits and [*317 sentences. And upon principle, where is there to be found a substantial difference between a sentence of condemnation and of acquittal in rem? If the former ascertains and fixes the forfeiture, and therefore, is *148 conclusive, the latter no less ascertains that there is no forfeiture, and therefore, restores the property to the claimant. It cannot be pretended, that a new seizure might, after an acquittal, be made for the same supposed offence; or if made, that the former sentence would not, as evidence, be conclusive, and, as a bar, be peremptory against the second suit in rem. And if conclusive either way, it must be, because the acquittal ascertains the fact, that there was no forfeiture. And if the fact be found, it is strange, that it cannot be evidence for the party, if found one way, and yet can be evidence against him, if found another way. If such were the rule, it wonld be a perfect anomaly in the law, and utterly subversive of the first principles of reciprocal justice. The only authority relied on for this purpose is a dictum in Buller's Nisi Prius 245, where it is said, that though a conviction in a court of criminal jurisdiction be conclusive evidence of the fact, if it afterwards come collaterally in controversy in a court of civil jurisdiction; yet, an acquittal in such court, is no proof of the reverse, for an acquittal ascertains no fact, as a conviction does. The case relied on to support this dictum (3 Mod. 164) contains nothing which lends any countenance to it. (Peake's Evid. 3d ed., p. 47, 48.) But assuming it to be good law, in respect to criminal suits, it has *nothing to do with proceedings in rem. Where [*318 property is seized and libelled, as forfeited to the government, the sole object of the suit is to ascertain whether the seizure be rightful, and the forfeiture incurred or not. The decree of the court, in such case, acts upon the thing itself, and binds the interests of all the world, whether any party actually appears or not. If it is condemned, the title of the property is completely changed, and the new title acquired by the forfeiture travels with the thing in all its future progress. If, on the other hand, it is acquitted, the taint of forfeiture is completely removed, and cannot be re-annexed to it. The original owner stands upon his title, discharged of any latent claims, with which the supposed forfeiture may have previously infected it. A sentence of acquittal in rem does, therefore, ascertain a fact, as much as a sentence of condemnation; it ascertains and fixes the fact that the property is not liable to the asserted claim of forfeiture. It should, therefore, be conclusive upon all the world, of the non-existence of the title of forfeiture, for the same reason that a sentence of condemnation is conclusive of the existence of the title of forfeiture. It would be strange indeed, if, when the forfeiture ex directo could not be enforced against the thing, but by an acquittal was completely purged away, that indirectly, the forfeiture might be enforced, through the seizing officer; and that he should be at liberty to assert a title for the government, which is judicially abandoned by, or conclusively established against, the government itself.
*319] *One argument further has been urged at the bar, on this point, which deserves notice. It is, that the sentence of acquittal ought not to be conclusive upon the original defendants, because they were not parties to that suit. This argument addresses itself equally to a sentence of condemnation; and yet, in such case, the sentence would have been conclusive evidence in favor of the defendants. The reason, however, of this rule is to be found in the nature of proceedings in rem. To such proceedings all persons having an interest or title in the subject-matter are, as we have already stated, in law, deemed parties; and the decree of the court is conclusive upon all interests and titles in controversy before it. The title of *149 forfeiture is necessarily in controversy, in a suit to establish that forfeiture; and therefore, all persons having a right or interest in establishing it (as the seizing officer has) are, in legal contemplation, parties to the suit. It is a great mistake, to consider the seizing officer as a mere stranger to the suit. He virtually identifies himself with the government itself, whose agent he is, from the moment of the seizure, up to the termination of the suit. His own will is bound up in the acts of the government in reference to the suit. For some purposes, as for instance, to procure a decree of distribution, after condemnation, where he is entitled to share in the forfeiture, or to obtain a certificate of reasonable cause of seizure, after an acquittal, he may make himself a direct party to the suit, and in all other cases, he is deemed to be present and represented by the government itself. By the very act of seizure, he agrees to become a party to *the suit, under the government; for [*320 in no other manner can he show an authority to make the seizure, or to enforce the forfeiture. If the government refuse to adopt his acts, or waive the forfeiture, there is an end to his claim; he cannot proceed to enforce that which the government repudiates. In legal propriety, therefore, he cannot be deemed a stranger to the decree in rem; he is, at all events, a privy, and as such must be bound by a sentence which ascertains the seizure to be tortious. But if he were a mere stranger, he would still be bound by such sentence, because the decree of a court of competent jurisdiction in rem is, as to the points directly in judgment, conclusive upon the whole world.
Upon principle, therefore, we are of opinion, that the sentence of acquittal in this case, with a denial of a certificate of reasonable cause of seizure, was conclusive evidence that no forfeiture was incurred, and that the seizure was tortious; and that these questions cannot again be litigated in any other forum. And if the point had never been decided, we should, from its reasonableness and known analogy to other proceedings, have had entire confidence in the correctness of the doctrine. But there are authorities directly in point, which have never been overruled, nor so far as we know, ever been brought judicially into doubt.
Above a century ago, it was decided by Mr. Baron PRICE (12 Vin. Abr. A, b, 22, p. 95), that an acquittal in the exchequer was conclusive evidence of the illegality of the seizure, and he refused, in that case (which was trover for the goods seized), to let the parties in *to contest the fact over [*321 again. This case was cited as undoubted law before Mr. Justice BLACKSTONE, in his elaborate opinion in Scott v. Shearman (2 W. Bl. 977); and the doctrine was fully recognised by the court, and particularly by Lord KENYON, in Cooke v. Sholl (5 T.R. 225), although that cause finally went off upon another point. In all the cases which have been decided on this subject, no distinction has ever been taken between a condemnation and an acquittal in rem, and the manner in which these cases have been cited by the court, obviously shows that, no such distinction was ever in their contemplation. If to these decisions we add the pointed language of Lord Chief Justice DE GREY (in the Duchess of Kingston's case, 11 State Trials 218, &c.), "that the rule of evidence must be, as it is often declared to be, reciprocal;" the declaration of Lord KENYON (in Geyer v. Aguilar, 7 T.R. 681, 696), that "where there has been a proceeding in the exchequer, and a judgment in rem, as long as that judgment remains in force, it is obligatory *150 upon the parties who have civil rights depending on the same question;" and the general rule laid down by Lord APSLEY (Meadows v. Duchess of Kingston, Amb. 756), that where a matter comes to be tried in "a collateral way, the decree of a court having competent jurisdiction shall be received as conclusive evidence of the matter," ex directo determined; there seems a weight of authority in favor of the doctrine, which it is very difficult to resist. We may add, that in a recent case, which was not cited at the argument (The Bennet, 1 Dodson 175, 180), where a ship had been captured *322] *as prize, as being engaged in an illegal voyage, and acquitted by the sentence of a vice-admiralty court, Sir W. SCOTT held, that by such sentence of a competent tribunal, the question had become res adjudicata, and might be opposed with success as a bar to any inquiry into the same facts, upon a second capture, during the same voyage. Yet, here, the parties, who were captors, were different; and the argument might have been urged, that the acquittal ascertained no fact. The learned judge, however, considered the acquittal conclusive proof against the illegality of the voyage, and that all the world were bound by the sentence of acquittal in rem. And the same doctrine was held by Mr. Justice BULLER, in his very learned opinion in Le Caux v. Eden (2 Doug. 594, 611, 612).[(a)]
*323] *This view of the case would be conclusive against the admission of the evidence offered by the original defendants, at the trial, as a justification of the asserted trespass. But the other point which has been stated, and which involves the construction of the act of 1794, ch. 50, § 3, is not less decisive against the defendants. That act inflicts a forfeiture of the ship, &c., in cases where she is fitted out and armed, or attempted or procured to be fitted out and armed, with the intent to be employed "in the service of any foreign prince or state, to cruise or commit hostilities upon the subjects, citizens or property of another foreign prince or state, with whom the United States are at peace." The evidence offered and rejected, was to prove that the ship was attempted to be fitted out and armed, and was fitted out and armed, with intent that she should be employed in the service of that part of the Island of St. Domingo which was then under the government of Petion, to cruise and commit hostilities upon the subjects, *151 citizens and property of that part of the Island of St. Domingo which was then under the government of Christophe. *No evidence was [*324 offered, to prove that either of these governments was recognised by the government of the United States, or of France, "as a foreign prince or state;" and if the court was bound to admit the evidence, as it stood, without this additional proof, it must have been upon the ground, that it was bound to take judicial notice of the relations of the country with foreign states, and to decide affirmatively, that Petion and Christophe were foreign princes, within the purview of the statute. No doctrine is better established, than that it belongs exclusively to governments to recognise new states, in the revolutions which may occur in the world; and until such recognition, either by our own government, or the government to which the new state belonged, courts of justice are bound to consider the ancient state of things as remaining unaltered. This was expressly held by this court in the case of Rose v. Himely (4 Cranch 241), and to that decision on this point we adhere. And the same doctrine is clearly sustained by the judgment of foreign tribunals. (The Manilla, Edw. 1; City of Berne v. Bank of England, 9 Ves. 347; Dolder v. Bank of England, 10 Ibid. 353; 11 Ibid. 283.) If, therefore, this were a fact proper for the consideration of a jury, and to be proved in pais, the court below were not bound to admit the other evidence, unless this fact was proved, in aid of that evidence, for without it, no forfeiture could be incurred. If, on the other hand, this was matter of fact, of which the court were bound judicially to take cognisance, then the court were right in rejecting the evidence, for so *far as [*325 we have knowledge, neither the government of Petion nor Christophe have ever been recognised as a foreign state, by the government of the United States, or of France.
In every view, therefore, of this case, the state court were right in rejecting the evidence, so far as it was offered in justification. Was it then admissible in mitigation of damages? Upon this point, we really do not entertain the slightest doubt. The evidence had no legal tendency to show that any forfeiture had been incurred, and upon the proof already in the cause, the seizure was established to be tortious. The plaintiff admitted, that the defendants had acted without malice, or an intention of oppression. Under such circumstances, he waived any claim for vindictive damages, and the state court very properly directed the jury, that the plaintiff could only recover the actual damages sustained by him. And in no possible shape, consistently with the rules of law, could the evidence diminish the right of the plaintiff to recover his actual damages.
We have taken notice of this point, the more readily, because it was pressed at the bar, with considerable earnestness. But in strictness of law, the point is not subject to our revision. We have no right, on a writ of error from a state court, under the act of congress, to inquire into the legal correctness of the rule by which the damages were ascertained and assessed. There is no law of the United States, which interferes with, or touches, the question of damages. It is a question depending altogether upon the common law; *and the act of congress has expressly precluded us from a [*326 consideration of such a question. Whether such a restriction can be defended, upon public policy, or principle, may well admit of most serious doubts.
*152 We may now pass to the consideration of the second plea, which asserts, as a defence, a seizure under the laws of the United States, by the express instruction of the president, for a supposed forfeiture in rem, and attempts to put in issue the question, whether such forfeiture was incurred or not. If this plea was well pleaded, then a question may properly be said to arise, within the meaning of the 25th section of the judiciary act, and as the state court decided against the right and authority set up thereon, the decision is re-examinable in this court. Several objections have been urged at the bar against the sufficiency of this plea, upon technical grounds; and if these objections are well founded, then it may be admitted, that the court below may have given judgment on these special grounds, and not have decided against the right and authority set up under the United States.
In the first place, it is argued, that this plea is bad, because it does not answer the whole charge in the declaration, the plea justifying only the taking and detention, and containing no answer to the damaging, spoiling and conversion of the property charged in the declaration. We are, however, of opinion, that the plaintiff can take nothing by this objection. The gist of the action in this case was the taking and detention, and the damaging, *327] spoiling and conversion were matter of aggravation only; *and it is perfectly well settled, that a plea need answer only the gist of the action, and if the matter alleged in aggravation be relied on as a substantive trespass, it should be replied by way of new assignment. (Taylor v. Cole, 3 T.R. 292; s.c. 1 H. Bl. 555; Dye v. Leatherdall, 3 Wils. 20; Fisherwood v. Cannon, cited 3 T.R. 297; Gates v. Bayley, 2 Wils. 313; 1 Saund. 28, note 3; Com. Dig. Plead. E. 1; Monprivatt v. Smith, 2 Camp. 175). Independent, however, of this general ground, there is, in this particular case, a decisive answer to the objection; for if the matter of the plea were true and well pleaded, then, by the forfeiture, the property was completely divested out of the plaintiff; and, consequently, neither the conversion nor damage were any injury to him.
But there are other defects in this plea which, in our judgment, are fatal. In the first place, it is not alleged, that the ship and her equipments were forfeited for any offence under the laws of the United States. It is true, that it is stated, that the ship was attempted to be fitted out and armed, with intent that she should be employed in the service of a foreign state, &c., to commit hostilities upon the subjects of another foreign state, &c., contrary to the statute in such case made and provided. But it is not added, whereby and for the cause aforesaid, she became and was forfeited to the United States. Nor is this deficiency supplied by the subsequent averment, that the ship was, by the instructions of the president, seized "as forfeited to the use of the United States;" for the manner and cause of the forfeiture *328] ought to *be directly stated. The plea is, therefore, not only argumentative, but it omits a substantive allegation, without which, it could not be sustained as a bar.
In the next place, the plea is bad, because it does not aver that the governments of Petion and Christophe are foreign states which have been duly recognised, as such, by the government of the United States, or of France, which, for reasons already stated, was necessary to complete the legal sufficiency of the plea.
And in our judgment, a still more decisive objection is, that the plea *153 attempts to draw to the cognisance of a state court, a question of forfeiture under the laws of the United States, of which the federal courts have, by the constitution and laws of the United States, an exclusive jurisdiction. For the reasons already mentioned, if the suit for the forfeiture was still pending, when the action was brought, that fact ought to have been pleaded in abatement, or as a temporary bar to such action: if the action was brought before proceedings in rem had been instituted, that fact ought to have been pleaded, with an allegation that the jurisdiction of the question of forfeiture exclusively belonged to the district court of the district where the seizure was made, which would have been a plea in the nature of a plea to the jurisdiction of the state court: if the suit were determined, then a condemnation, or an acquittal, with a certificate of reasonable cause of seizure, ought to have been pleaded, as a general bar to the action These are all the legal defences which the mere seizure could justify; and if these all failed, then the *seizing officer must have been deemed [*329 guilty of the trespass. The plea, then, stops short of the allegations which the seizing officer was bound to make, to sustain his defence, and it attempts to put in issue matter which, standing alone, no court of common law is competent to try. The demurrer, then, may well be sustained to this plea, since the party demurring admits nothing except what is well pleaded, and the plea being bad in substance, there is, in point of law, no confession of any forfeiture.
The third plea differs in several respects from the second, and is that on which the court have felt their principal difficulty. It asserts, that the ship was attempted to be fitted out and armed, with intent that she should be employed in the service of some foreign state, to commit hostilities upon the subjects of another foreign state, with which the United States were then at peace, contrary to the form of the statute in such case made and provided; and that the defendants, by virtue of the instructions of the president, "did take possession of, and detain," the said ship, &c., "in order to the execution of the prohibitions and penalties of the act in such case made and provided." It omits to allege any forfeiture of the ship, or that she was seized as forfeited. So far then as the plea may be supposed to rely on such forfeiture as a justification, it is open to the same objections which have been stated against the second plea. Another objection has been urged at the bar against this plea, which does not apply to the second. It is, that it does not specify the foreign state in *whose service, or against whom, [*330 the ship was intended to be employed. As the allegation follows the words of the statute, it has sufficient certainty for a libel or information in rem, for the asserted forfeiture under the statute; and consequently, it has sufficient certainty for a plea. Indeed, there is as much certainty as there would have been, if it had been averred that it was in the service of, or against, some foreign state, unknown to the libellant, which has been adjudged in this court, to be sufficient in an information of forfeiture. (Locke v. United States, 7 Cranch 339.)
But the main objection to this plea is, that it attempts to justify the taking possession and detaining of the ship, under the instructions of the president, when the facts stated in the plea do not bring the case within the purview of the statute of 1794, ch. 50, which is relied on for this purpose. This statute, in the seventh section, provides, that in every case in which a *154 vessel shall be fitted out and armed, or attempted to be fitted out and armed, or in which the force of any vessel of war, cruiser or other armed vessel, shall be increased or augmented, or in which any military expedition or enterprise shall be begun, or set on foot, contrary to the prohibitions and provisions of that act, and in every case of the capture of a ship or vessel, within the jurisdiction or protection of the United States, and in every case in which any process, issuing out of any court of the United States, shall be disobeyed or resisted by any person or persons, having the custody of any vessel of war, cruiser or other armed vessel of any foreign prince or state, *331] *or of the subjects or citizens of any such prince or state; in every such case, it shall be lawful for the president of the United States, or such other person as he shall have empowered for that purpose, to employ such part of the land or naval forces of the United States, or of the militia thereof, as shall be judged necessary for the purpose of taking possession of and detaining any such ship or vessel, with her prize or prizes, if any, in order to the execution of the prohibitions and penalties of the act, &c.
It is to be reccollected, that this third plea does not allege any forfeiture, nor justify the taking and detaining of the ship, for any supposed forfeiture; and that it does not allege, that the president did employ any part of the land or naval forces, or militia of the United States for this purpose, or that the original defendants, or either of them, belonged to the naval or military forces of the United States, or were employed in any such capacity, to take and detain the ship, in order to the execution of the prohibitions and penalties of the act. But the argument is, that as the president had authority by the act, to employ the naval and military forces of the United States for this purpose, à fortiori, he might do it by the employment of civil force. But upon the most deliberate consideration, we are of a different opinion. The power thus intrusted to the president is of a very high and delicate nature, and manifestly intended to be exercised only when, by the ordinary process or exercise of civil authority, the purposes of the law cannot be effectuated. It is to be exerted on extraordinary occasions, and subject to *332] that high responsibility *which all executive acts necessarily involve. Whenever it is exerted, all persons who act in obedience to the executive instructions, in cases within the act, are completely justified in taking possession of, and detaining, the offending vessel, and are not responsible in damages, for any injury which the party may suffer by reason of such proceeding. Surely, it never could have been the intention of congress, that such a power should be allowed as a shield to the seizing officer, in cases where that seizure might be made by the ordinary civil means? One of the cases put in the section is, where any process of the courts of the United States is disobeyed and resisted; and this case abundantly shows, that the authority of the president was not intended to be called into exercise, unless where military and naval force were necessary to insure the execution of the laws. In terms, the section is confined to the employment of military and naval forces; and there is neither public policy nor principle, to justify an extension of the prerogative, beyond the terms in which it is given. Congress might be perfectly willing to intrust the president with the power to take and detain, whenever, in his opinion, the case was so flagrant, that military or naval force were necessary to enforce the laws, and yet, with great propriety, deny it, where, from the circumstances *155 of the case, the civil officers of the government might, upon their private responsibility, without any danger to the public peace, completely execute them. It is certainly against the general theory of our institutions, to create great discretionary powers by implication; and in the present instance, *we see nothing to justify it. The third plea is, therefore, [*333 for this additional reason, bad, in its very substance, and the state court were right in giving judgment on the demurrer for the original plaintiff.
The judgment of the court for the correction of errors of the state of New York is affirmed, with damages at the rate of six per cent. upon the judgment, from the rendition thereof, and costs.
JOHNSON, Justice.
As the opinion delivered in this case goes into the consideration of a variety of topics which do not appear to me to be essential to the case, I will present a brief view of all that I consider as now decided.
Three pleas are filed to the action. The first is the general issue, under which, according to the practice of the state from which the case comes, notice was given that the forfeiture would be given in evidence. The second plea is a justification, on the ground of a seizure under the order of the president, for the forfeiture incurred under the third section of the act of 1794. The third is a justification under the order of the president, to detain for the purpose of enforcing the prohibitions and penalties incurred under the third section. And this order is supposed to have been issued under authority given in the seventh section.
On the first plea, issue was taken; and on the trial, the state court refused to admit evidence of the forfeiture, *on the ground that the [*334 acquittal in the district court was conclusive against the forfeiture. And on this point, this court is of opinion, that the state court decided correctly. This court is also of opinion, that the state court could not have tried the question of forfeiture arising under the laws of the United States. But this point would have been fatal to the suit, not to the defence, had it been properly pleaded. To the second and third pleas, the defendant demurred: but as the second plea contained only an argumentative, and, of course, defective averment of the forfeiture, viz., "seized as forfeited," that is "because forfeited," that plea did not bring up the question of forfeiture, or any question connected with it. Neither does the third plea bring up the question of forfeiture: for the justification therein relied on is wholly independent of the forfeiture, and rests upon the order of the president to detain for trial, in effect. And hence, the only other point in the case is, whether the seventh section of the act empowered the president to issue such an order. And on this point, we are of opinion, that there is no power given by that act, to authorize a seizure, but only to call out the military or naval forces to enforce a seizure, when necessary. The defence set up is not founded upon the exercise of such a power, but upon a supposed order to the defendants, in their private individual character, to take and detain. The act, therefore, does not sustain the defence.
Judgment affirmed.
*D.B. Ogden inquired, to which of the state courts the mandate [*335 to enforce the judgment was to be transmitted.
*156 MARSHALL, Ch. J.  We must consider the record as still remaining in the supreme court of New York, and consequently, the mandate must be directed to that court.
 Mandate to the supreme court of New York.
JUDGMENT.  This cause came on to be heard, on the transcript of the record of the supreme court of judicature of the people of the state of New York, returned with the writ of error issued in this case, and was argued by counsel: On consideration whereof, it is adjudged and ordered, that this court having the power of revising, by writ of error, the judgment of the highest court of law in any state, in the cases specified in the act of congress, in such case provided, at any time within five years from the rendition of the judgment in the said courts, have the power to bring before them the record of any such judgment, as well from the highest court of law in any state, as from any court to which the record of the said judgment may have been remitted, and in which it may be found, when the writ of error from this court is issued. And the court, therefore, in virtue of the writ of error in this cause, do proceed and take cognisance of this cause upon the transcript of the record now remaining in the supreme court of judicature of the people of the state of New York; and they do hereby adjudge and order, that the judgment of the court for the trial of impeachments and *336] *correction of errors in this case be, and the same is hereby affirmed, with costs and damages, at the rate of six per centum per annum on the amount of the judgment of the said court for the trial of impeachments and correction of errors of the state of New York, to be computed from the time of the rendition of the judgment of the said court for the trial of impeachments and correction of errors of the state of New York.
NOTES
[(a)] In a recent case, in the court of exchequer, in England, it has been determined, that a judicial sale of a vessel, found at sea, and brought into port as derelict, under an order of the instance court of admiralty, on the part of the salvors and claimant (without fraud and collusion), is available against the crown's right of seizure for a previous forfeiture, incurred by the ship having been guilty of a forfeitable offence against the revenue laws: although the crown was not a party to the proceeding in the admiralty court, other than by the king's procurator-general claiming the vessel as a droit of admiralty; and although no decision of droit or no droit was pronounced, and the sale took place pendente lite, under an interlocutory order. It was held, that the crown should have claimed before the court, either as against the ship, in the first instance, or subsequently, against the proceeds of the sale, which were paid into the registry to answer claims under the order of sale, or have moved a prohibition. That the warrant for arresting the ship by the admiralty, and the process of citation, was notice to all the world of the subsequent proceedings: and that in pleading such sale, in defence to an information in the exchequer, the facts should be put specially on the record, so that the attorney-general might demur to or traverse them. The Attorney-General v. Norstedt (claiming the ship Triton), 3 Price 97. See Wynne's History of the Life of Sir Leoline Jenkins, vol. 2, p. 762.