On the argument the counsel for the defendant insisted that the court should review the order made by the supreme court, denying the motion made in that court in November, 1849, to dismiss the appeal in that court, it being an intermediate order involving the merits and necessarily affecting the judgment.
Preliminary to the argument on the merits, that question was discussed; but a decision of it was finally reserved, and the argument, on the merits of the cause, proceeded. It is proper, therefore, in the first place, to dispose of this question.
The facts in respect to it are substantially these: The suit was commenced in 1845, before the chancellor; was put at issue and the proofs closed by an order entered on the 30th day of June, 1847. On the second Monday of December, in the same year, it was brought to argument before the supreme court at a special term, when a decree was made *Page 387 
therein dismissing the bill as to the defendant Newbury, with costs to be taxed, to be paid by the complainant, and was duly entered with the clerk of Herkimer county, and a copy thereof with notice of the same was served on the solicitor, for the complainant, on the 22d day of January, 1848. At a general term of the supreme court held in the fifth district in July, 1848, the complainant applied for a rehearing, which was denied, from which order he appealed to this court. In December term, 1848, the appeal was dismissed, with costs to be taxed, and on the 3d day of February, 1849, the decree was enrolled and docketed for the costs decreed, including the costs of the appeal to this court, amounting to $198.35, which subsequently in the same month was collected by an execution issued upon the decree.
On the 29th of June, 1849, notice of an appeal from the said decree so made at the special term, with the copy of an undertaking, was served on the solicitor for the defendant by the solicitor for the complainant, with a notice of argument for the then next general term appointed to be held in the fourth district on the first Monday in September then next, upon which the defendant's solicitor gave notice of a motion to be made in the same court at the same time to dismiss the appeal. The motion was made, and at November term, 1849, was denied. (4 How. Pr.R., 145.) At January term, 1850, the cause was argued at the general term of the supreme court held in the fifth district, and at the next May term, that court made a decree affirming the decree of the special term, with costs: from that decree, the complainant appealed to this court. The supreme court was organized under the act "in relation to the judiciary," passed May 12, 1847 (Laws of that year, 319), and by § 16 of that act was vested with all the powers, which the late supreme court and court of chancery possessed. By § 24 of that act it was provided that a general term of the supreme court organized by that act, should be held at the capitol in the city of Albany, on the first Monday of July, 1847, and among *Page 388 
other things, to "establish, revise and alter the rules of said court." By § 20 of said act, the right to apply at a general term for a rehearing of such a decree as was made at the special term in this case, was conferred on the complainant, but the time and manner of making such application, not being provided for by the statute, were left to be provided for and regulated by the rules of practice to be adopted by the supreme court at a general term to be held pursuant to § 24. I have already remarked that the supreme court thus organized was vested with all the powers which the late court of chancery and supreme court possessed. It had therefore the power to prescribe the time and manner of making such application. The provisions of 2 R.S., 175, § 46; 177, §§ 55, 57; 178, §§ 67; 200, § 28, were directly applicable to the present supreme court. That court, at a general term held pursuant to § 24, adopted rules of practice, and by the 78th rule it was provided that notice of an application for a rehearing before the court at a general term might be served at any time within thirty days after service of the decree or order complained of. The motion for a rehearing was made in July term, 1848, as I have before stated, and was denied on the ground that a notice of the application, specifying the time and place of making the motion, was not served until after the expiration of thirty days from the time of service of a copy of the decree and notice. The court held that the service of such notice was an irregularity, fatal to the application, although no delay in the hearing was the consequence of such omission.
By § 7 of the act to facilitate the determination of existing suits in the courts of this state, passed April 12, 1848, which, with the exception of § 2, took effect on that day, it was provided, among other things, that no rehearing should be had at a general term of the supreme court, of an order or decree made at a special term, unless notice of the same should be given within two days after notice of the order or decree to be reheard. This provision is continued in § 7, *Page 389 
of a similar act passed April 11th, 1849. (Laws 1849, 707.)
It was not claimed by the counsel for the complainant that the appeal from the decree made at the special term had been taken in pursuance of any of the provisions of the judiciary act of 1847, or of the act to facilitate the determination of existing suits to which I have referred, but under the provisions of § 460 of the Code as amended by the act of the 11th of April, 1849. (Lawsof that year, 703.) That section provides that "an appeal may be taken from any final decree entered upon the direction of a single judge, in any suit in equity, pending in the supreme court on the first day of July, one thousand eight hundred and forty-seven, within ninety days from the time this act shall take effect; but this section shall not apply to cases where a rehearing has already been had or ordered, and such appeal shall be taken in the manner provided in section three hundred and twenty-seven and three hundred and forty-eight."
On the part of the defendant it was contended that this section did not apply to this case, because the suit, in which the decree appealed from was made, was not pending in the supreme court on the day mentioned in the law; namely, the 1st day of July, 1847. That fact does not admit of any question, for no suit which was pending either in the late court of chancery or supreme court at the time the constitution of 1846 took effect, was transferred to the present supreme court until the first Monday (which was the fifth day) of July, 1847. (Const., art. 14, § 5.) It was, however, insisted that § 460 should be construed as applying to such suits, although they were not pending in the supreme court until the first Monday of July, 1847, notwithstanding the words of the act; on the ground that it was obvious that the legislature intended it to have that application. It is clear that unless it can have such application, it is wholly nugatory, for there was no suit pending in the supreme court on the day specified in the act, and of course there could not be *Page 390 
any decree made in any such suit referred to. When the words of an act are doubtful and uncertain, it is proper to inquire what was the intent of the legislature; but it is very dangerous for courts to launch out too far in searching into the intent of the legislature, when they have expressed themselves in plain and clear words. It is well settled that in construing a statute the intention of the legislature is a fit and proper subject of inquiry. That intention, however, is to be collected from the act itself, and other acts, in pari materia.
The general rules on this subject require that such construction ought to be put upon a statute as may best answer the intention which the makers had in view, which may sometimes be collected from the cause or necessity of making the statute, and sometimes from other circumstances; and whenever such intention can be discovered, it ought to be followed with reason and discretion, in the construction of the statute, although such construction seem contrary to the letter of the statute. Where any words are obscure or doubtful, the intention of the legislature is to be resorted to in order to find the meaning of the words. A thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter; and a thing which is within the letter of a statute, is not within the statute, unless it be within the intention of the makers; and such construction ought to be put upon it as does not suffer it to be eluded. (Bac. Abr., tit., stat. 9, 5, 10; 2Kent Com., 462; The Watervliet Turnpike Company v. McKean,
6 Hill, 616, and the cases there cited; Dwarris on Statutes,
690, 696, 703.)
The provision made for an appeal by § 460 is sensible if applied to decrees made in suits pending in the supreme court on the first Monday of July, 1847, but entirely senseless if applied to decrees made in suits pending on the 1st day of July in that year.
If we look into the several statutes passed by the legislature, to provide for the organization of the courts under the *Page 391 
new constitution and for the subsequent proceedings in suits pending in the present supreme court after their transfer from the late courts, by force of the constitution, it cannot, I think, be doubted, but that § 460 aimed at such suits, and that the mistake in referring to them — as to the day when they were so transferred, until which time no suit was pending in the present supreme court — was purely clerical; I am therefore of opinion that the provision contained in that section was applicable to this suit, although not pending in the supreme court until the first Monday, the 5th day of July, 1847.
It was next contended by the defendant that § 460 was void as having been passed by the legislature in violation of art. 1, § 10, subd. 1, of the constitution of the United States. The provision referred to, prohibits any state, among other things, from passing any ex post facto law, or law impairing the obligation of contracts.
The clause, "that no state shall pass any ex post facto law, means nothing more than that the legislatures of the several states, shall not pass laws after a fact done by a person, which shall have relation to such fact, and shall punish him for having done it.
The object of the provision was not to secure persons in their private rights either of property or contract. That provision is not applicable to civil laws, which affect private rights retrospectively, but to penal and criminal laws, which impose punishments or forfeitures, for acts indifferent in themselves when committed, by a law passed subsequently. Calder v. Bull,
3 Dallas, 386; Fletcher v. Peck, 6 Cranch, 138; Ogden
v. Saunders, 12 Wheaton, 266; Satterlee v. Ma thewson, 2Peters, 380; Watson v. Mercer, 8 Peters, 110.)
The general interpretation has been, and is, as is said by the late Judge STORY (3 Story Com. on the Const. of the U.S., § 1339), that the phrase, ex post facto laws, applies to acts of a criminal nature only; and that the prohibition reaches every law, whereby an act is declared a crime and made *Page 392 
punishable as such, when it was not a crime when done; or whereby the act, if a crime, is aggravated in enormity, or punishment; or whereby different or less evidence is required to convict an offender, than was required when the act was committed. (1 KentCom. 408.)
If the effect of the act in question was to divest Newbury of an antecedent vested right, but not to impair the obligation of any contract, it is not void as contrary to the constitution of the United States. For it is well settled that that instrument does not prohibit the states from passing retrospective laws, divesting antecedent vested rights of property, provided such laws do not impair the obligation of contracts, or partake of the character of ex post facto laws, however repugnant they may be to the principles of sound legislation. (Charles River Bridge
v. Warren Bridge, 11 Peters, 539, 540.)
Under our form of government the legislature is not omnipotent, whatever the parliament of England may be in theory. It is only one of the organs of that absolute sovereignty which resides in the whole body of the people. It has the power, subject to the qualified negative of the governor, to pass any law which it may deem necessary for the public good, not inconsistent with the first principles of government, nor contrary to the provisions of the constitution of this state or of the United States.
It is a familiar principle in jurisprudence, that a statute shall not have a retrospective effect so as to destroy a vested right. (Mann v. Eckford's Executors, 15 Wend., 519.)
The late Chancellor KENT says (1 Kent Com. 455, § 20), that a retrospective statute, affecting and changing vested rights, is very generally considered, in this country, as founded on unconstitutional principles and consequently inoperative and void. This doctrine, however, is not understood to apply to remedial statutes, which may be of a retrospective nature provided they do not impair contracts or disturb absolute vested rights, and only go to confirm rights already existing, and in furtherance of the remedy by *Page 393 
curing defects, and adding to the means of enforcing existing obligations. I cannot assent to the doctrine supposed to be advanced in Butler v. Palmer (1 Hill, 324), that the legislature has unlimited power to interfere with vested rights, unless they be saved by some restriction to be found in the federal or state constitution. (1 Kent Com., 5 ed., 456,note A; Wilkinson v. Leland, 2 Peters, 657.) There is, unquestionably, a distinction between the obligation of a contract and the remedy given to enforce that obligation, and thus without impairing the obligation of the contract, the remedy may be modified as the wisdom of the legislature may direct, with the qualification that I have before mentioned.
In Dash v. Van Kleek (7 Johns., 477), Mr. Justice SPENCER says, in reference to the power of the legislature, that he should undoubtedly deny that it could annul an existing judgment, because then there immediately arises a contract against the party adjudged to pay a sum of money in favor of him to whom it is awarded.
Previous to the passage of the act (§ 460) the defendant Newbury had obtained a complete and final decree against the complainant Burch, for the payment of a specific sum of money, and although there had existed, at the time of making the decree, a right in the complainant, for a time limited by law, to have the cause or matter in controversy between the parties, upon which the decree was made, reheard before the judges of the supreme court at general term, and an appeal from the decree that should be made by that court on such rehearing to the court of last resort — and a remedy full and complete to enforce such right — he allowed the time prescribed for pursuing his remedy to elapse without taking any steps to procure a rehearing; and thereby, as the law then stood, the decree obtained became indefeasible, completely vesting Newbury with the right to the money decreed to him which had been paid or collected of Burch, pursuant to the terms of the decree. *Page 394 
Thus situated, the legislature interfered; not to prescribe a rule for all future cases, but to provide a new remedy for the benefit of a class of persons to obtain a rehearing by appeal, in suits in which decrees had been made and become final against them, where the right to a rehearing at the time not only existed, but had been previously and intentionally abandoned — and thereby not only to impose upon the party in whose favor the decree was made, the expense and inconvenience of another hearing, but to subject all his rights and claims in the matters in controversy, which had been determined and become vested and absolutely fixed by the law then in force, to the uncertainty of future litigation, to be lost or saved as accident and opinion might afterwards happen to injure or befriend them.
The misfortune of having vested rights, under judgments and decrees of our courts, thus disturbed is far from being trivial, if we consider that on this principle no judgment whatever in a court of law can be rested upon as final.
But it was said by the learned judge on denying the application to dismiss the appeal brought under § 460, that the act was not unconstitutional; that it was merely a provision to extend the time for bringing an appeal; that it affected the remedy only, and did not impair the obligation of contracts or take away a vested right. Several cases were cited, and among them the case of Calder v. Bull (3 Dallas, 386), as being an express authority in affirmance of the constitutionality of the section referred to. I do not understand such to be the effect of the decision in that case. It was this: On the 21st of March, 1793, the court of probates for Hartford county disapproved of the will of N. Morrison, and refused to record it. No appeal was made from that decree in eighteen months, and by that neglect and a statute of Connecticut all right of appeal was barred. In May, 1795, the legislature of Connecticut passed a resolution or law, setting aside the decree, and granted a new hearing by the same court of probates, with a right of appeal *Page 395 
in six months. A new hearing took place; the will was approved and ordered to be recorded; an appeal was taken to the superior court of the state, who affirmed the decree; and on appeal from that court to the court of errors of Connecticut, it was affirmed. From that court it went before the supreme court of the United States, where it was contended on the one side that the said resolution or law of the legislature of Connecticut, granting a new hearing in the case before the probate court, was an ex post facto law, and as such contrary to the constitution of the United States, and therefore void. Whether the resolution or law mentioned was within the provision of the federal constitution, prohibiting any state from passing any ex postfacto law, was the sole question raised or decided in the case, and in respect to that, the court held that the prohibition applied only to criminal and not to civil cases. The resolution or law under consideration was viewed rather as a judicial than a legislative act; it being a mode of obtaining a new trial, authorized by the course of judicial proceedings in that state; that at all events, if it was to be considered a legislative act, not being an ex post facto law, within the meaning of the constitution, it did not belong to that court to declare it void. CHASE, J., said that he was fully satisfied that that court had no jurisdiction to determine that any law of any state legislature contrary to the constitution of such state, was void. And further, if that court had such jurisdiction, yet it did not appear to him that the resolution or law, in question, was contrary to the charter of Connecticut, or its constitution, which was said to be composed of its charter, acts of assembly, and usages and customs.
PATERSON, J., observed, that the legislature of Connecticut acted in a double capacity, as a house of legislation with undefined authority, and also as a court of judicature in certain exigencies; and he came to the conclusion that the legislature in that instance acted in its accustomed judicial capacity. *Page 396 
The direct effect of the act in question, if valid, is the granting of a new trial or hearing upon all the questions both of law and evidence arising in the case, after it had been lost by the neglect of the complainant under the provision of law as this existed at the time the decree was made and after it had become final upon the rights of the parties involved in the suit, and the defendant had acquired possession of the fruits of the litigation by due execution upon it. If the act is not invalid upon principles which I have endeavored to state, as I think it is, it seems to me that it is contrary to the clause in article 1, § 6, of the constitution of this state, which provides that "no person shall be deprived of life, liberty or propertywithout due process of law."
The act assumes to create the means by which the complainant may open the decree for a reconsideration and adjudication upon the merits in controversy in the suit between the parties, irrespective of the present decree substantially, by another court having power to alter, modify or reverse the decree and to make a new decree adjudging money to be paid by the defendant to the complainant. In such an event, the money adjudged to and obtained by the defendant under the existing decree, would be taken from him and returned to the complainant, and the means provided by which — upon the contingency, that the appellate court shall come to a contrary conclusion upon the merits of the controversy from that which the court, pronouncing the decree, came — it might and would be done.
It is in effect doing more than merely annulling a complete and final decree, by which property has been acquired and possessed. Contingently, it not only deprives such person of the property thus acquired, but compels him to pay to his adversary such sum of money as the appellate court may determine he ought to pay.
That the money adjudged to be paid by the decree and received by the defendant under it, was his property in a legal sense, at the time of the passing of the act, cannot *Page 397 
admit of any doubt; he owned, had a legal title and was in possession of it.
It is true the act does not absolutely deprive the defendant of the money decreed to him, but it does contingently in effect. I think the provision contained in the constitution referred to, secures a person against being deprived of his property, either contingently or absolutely. If the appeal authorized to be taken by the act may result in depriving the defendant of his property, it is in my opinion contrary to the constitution.
It cannot be pretended that the words "without due process of law," used in the constitutional provision, mean a statute passed for the purpose of working the wrong. They cannot mean less than a prosecution or suit instituted and conducted according to the prescribed forms and solemnities for determining the title to property. (Taylor v. Porter, 4 Hill, 146, 147.) My opinion therefore is, that the order denying the motion to dismiss the appeal should be reversed, as also the decree appealed from, and the appeal be dismissed with costs. But if I am mistaken in the conclusions to which I have come, as above stated, I think the decree appealed from should be affirmed substantially for the reasons given by the learned judges who ordered the decree at the special term and affirmed it at the general term. (1 Barb.,
648.)
All the judges concurred in the opinion of WELLES, J., except GARDINER, J., who disssented.
Decree affirmed. *Page 398